UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

J.D. FULLER,

               Petitioner,

                                                Case No. 08-12684

v.                                        Honorable David M. Lawson

BLAINE LAFLER,

               Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner J.D. Fuller, presently confined at the Michigan Department of Corrections's Chippewa Correctional Facility in Kincheloe, Michigan, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 to challenge his 2003 convictions of seven counts of first-degree criminal sexual conduct (CSC I) and two counts of second-degree criminal sexual conduct (CSC II), involving his granddaughters, who were age ten and six at the time of the incidents. He offers several reasons why his convictions and sentences are unconstitutional, including prosecutorial misconduct, insufficient evidence, improper admission of "other acts" evidence, ineffective assistance of trial and appellate counsel, and improper sentencing. But his main contention is that his right to confront his accuser guaranteed by the Sixth Amendment was abridged when he was not allowed to cross-examine his older granddaughter about her other sexual experiences to show where she might have acquired knowledge of the graphic sexual acts committed by the petitioner that she described in her testimony. The petitioner exhausted all of these claims in the state court either on direct appeal or post-conviction motion. The respondent contends that the petition was filed out of time, many of the claims are barred because the petitioner did not raise them first on direct appeal, and none of the claims has merit. The Court is unimpressed with the respondent's procedural

defenses, but it does believe that the convictions and sentences are constitutionally sound. Therefore, the Court will deny the petition.

I.

The criminal charges stem from incidents that occurred between January 2002 and May 2003. The petitioner was the senior pastor at a church in Ypsilanti, Michigan. The victims in this case were his granddaughters, SP, aged ten, and YH, aged six. They stayed in his home in Detroit for several days at a time while their mother worked. Three of the CSC I convictions and one of the CSC II convictions pertained to the younger granddaughter, YH, and involved incidents of digital penetration. The other four CSC I convictions and one CSC II conviction involve the older granddaughter, SP, and result from three incidents of fellatio and one incident of digital penetration.

Because the petitioner's claims include allegations of insufficient evidence and possible fabrication of information by one of the children, the trial evidence will be described in detail. The state's allegations focused on activities that occurred in the petitioner's home. Darlene Fuller, the petitioner's wife, testified that the petitioner was the girls' primary care-giver, picking them up from school, feeding them, washing their clothes, buying them clothes when they did not have adequate clothing, taking them to church, and participating in other activities while their mother worked. She said there were occasions when SP lied to get Mrs. Fuller in trouble, but she left it to the petitioner to handle the situation. Both girls and their brother often spent the night or the weekend at their home. Mrs. Fuller testified that from 1999 to 2001, the girls and their parents lived with them.

Mrs. Fuller further testified that a nightstand on the petitioner's side of the bed contained a drawer that held some body oil, K-Y jelly, body syrup, papers, and an old telephone. She said that sometime in 2002, she caught SP with the K-Y jelly. Mrs. Fuller used the body oil on herself and

-2-

the children when their skin was "ashy." Mrs. Fuller testified that the only pornography in the house was a gag tape the couple received as a wedding gift that was kept in that same drawer. She also said that different types of body lotions were kept in the downstairs linen closet.

Mrs. Fuller testified about a time when SP complained about itching; she had a small rash on her inner upper thighs. She said she showed SP how to apply ointment to the rash. Although YH did not have a rash, Mrs. Fuller said she insisted that ointment be put on her legs, too. Mrs. Fuller said the petitioner never applied the ointment to the girls.

Mrs. Fuller also testified that the petitioner had old surgical scars on the outside of both upper thighs, which were not visible even if he wore shorts. The scars were the result of bilateral hip-replacement surgery. She said the petitioner had shown the scars to SP because she wanted to see them. The petitioner suffered pain from his hip surgery and at times walked with a cane and took medication to ease the pain. She testified that his surgery had a negative impact on their sex life.

Jannetta Hephzibah, the girls' mother and the petitioner's biological daughter, testified that she needed child-care assistance because she worked late nights at her job; her mother kept her children during the week and the petitioner kept them on weekends. She said sometimes her brother also would watch them. Hephzibah testified that she felt comfortable leaving her children with the petitioner, and neither child ever told her that they felt uncomfortable around him. Hephzibah confirmed that she, her husband, and the children lived with the petitioner and his wife for about four months.

YH, the younger child, testified that she did not know how many times she spent the night at the petitioner's house, but it was "a lot of times" when she was about five or six years old. She said both SP and her brother also spent the night.

YH testified that the petitioner and his wife did fun things with her, but she said that when she was six years old, the petitioner did something to her that he should not have done. YH described an incident in the TV room when the petitioner got on the couch with her, pulled her onto his lap, put the covers over her, and put his hands into her pants. She said she could feel the petitioner's hand moving around, touching her "private part," which she defined as the "part" girls used to go to the bathroom. She said he did that to her more than three different times.

YH testified that besides putting his hand on her private part, the petitioner sometimes put cream on his finger and then put it on her private part. She also testified that sometimes the petitioner put oil on a cotton ball and rubbed it around on her private part. She said those incidents also occurred in the TV room. YH testified that her sister and brother were in the room when the petitioner did those things to her. She said sometimes it happened during the day and other times it happened at night.

YH also testified that the petitioner did the same thing to her "bottom" that he did to her "private." She said he put his finger on her bottom and moved it around, but she was not sure which part of her bottom the petitioner's finger touched. She said he did not make her do anything to his body. She never saw his private part and did not know if he had any scars. She never saw him without any clothes. YH said she never witnessed the petitioner doing anything to her brother.

YH also said that after each incident, the petitioner told her that she could not tell anyone, and, if she did, then he would "whop" her. Even though she did not believe that he would "whop"

-4-

her, she did not tell anyone.  The first person she told was her twelve-year-old cousin.  The cousin

told her to tell her mother.  She said she and SP then told their mother about what the petitioner has

done.  YH further testified that their mother did not believe them at first, but "when we told her the

rest of the story, she believed us."  Trial Tr., Sept. 16, 2003, at 231.

The girls' mother then took them to their grandmother's house and the girls told the

grandmother what happened.  Their grandmother told their uncle.  The petitioner then came over to

the house and their mother told him what the girls said he did to them.  When the petitioner heard

the story, he denied it happened.  YH said she also told the police, the doctor who examined her at

the hospital, and to a lady at "Kid's Talk" what happened.  YH testified that she did not tell anyone

right away because she was scared that "my mama was going to whop us because my grandfather

is my mom's father."  Trial Tr., Sept. 16, 2003, at 213-14.

SP, the older child, testified that the petitioner once showed her a scarey vampire movie she

had selected and a "black tape" he kept in his bedroom.  She testified that on the "black tape" she

saw naked people "doing nasty stuff," such as taking off their clothes, kissing, and touching each

other's bodies and "making love" using their "private parts."  Trial Tr., Sept. 17, 2003, at 40-42.

SP said that once, after seeing the movie, she screamed and her sister came upstairs.  She said the

petitioner took the movie out of the video player.  The "vampire movie" was a "regular movie" with

"parts we weren't supposed to see" that was rated PG-13.  Trial Tr., Sept. 17, 2003, at 44-45.

SP further testified that when she was ten years old, the petitioner told her to get a white

bottle with cherries from a drawer in the bedroom.  After she brought the bottle back to him, he put

some of it on his "private part" and "made" her "suck" it off.  Trial Tr., Sept. 17, 2003, at 55-56.

She said the petitioner would make noises and breathe "like he's out of breath or something."  She

testified that the petitioner's "private part" went into her mouth and sometimes white stuff that tasted sour and sweet came out of his "pee hole." Trial Tr., Sept. 17, 2003, at 57-58. She said after it was over, the petitioner would tell her that he loved her and would put his private part back into his pants. SP testified that she went into the bathroom and spat the white stuff into the toilet and rinsed out her mouth. She testified that she had to put the petitioner's private into her mouth "lots of times," at least "more than three" times, and that "white stuff" came out "most of the time." Trial Tr., Sept. 17, 2003, at 59-64.

SP also testified that the petitioner used the "cherry stuff" some of the time, and other times he used lotion, baby oil, or body wash that was kept in the downstairs linen closet. She explained that when the petitioner used the body wash, he put it on his hands, put it on her private part, and started playing with it by putting his finger in it and "wiggling" it around. She said it hurt. She said that occurred while they both were lying on the couch in the den, and happened "mostly all the time," or "more than three" times. Trial Tr., Sept. 17, 2003, at 64-67.

SP also told the jury that the petitioner put oil on his "private part" and then put it inside "the back of me," when they were upstairs in his bedroom. Trial Tr., Sept. 17, 2003, at 68-70. When she told him that it hurt, he told her that it was not supposed to feel good. She said that happened twice. She admitted that she did not tell police about the incident because "I was shy," and that she did not tell the forensic interviewer because "I was scared she was going to cry." Trial Tr., Sept. 17, 2003, at 70-71. When asked what made her decide to tell the Kid's Talk forensic interviewer about the oral sex but not the anal sex, she testified, "I had to tell her something. If I didn't tell her anything the situation would have never been dealt with." Trial Tr., Sept. 17, 2003, at 71.

SP also described an incident in which the petitioner woke her up early in the morning after his wife had gone to work, took her into his bedroom, laid her on the bed, took off his robe, got into bed on top of her, "stuck his private part in mine," and "kept going up and down." Trial Tr., Sept. 17, 2003, at 76-77. There were other times when he would put her on top of him. She testified that it happened "a lot," "more than ten times." Trial Tr., Sept. 17, 2003, at 147. SP further testified that the petitioner made her touch his private part with her hand. She also testified about an incident occurring in the bathroom, where he played with her private part with his finger as he sat on the toilet.

SP admitted that she had not told anyone about the incidents because "I wanted him to see how it felt when something bad happened to me and wanted him to know how it feels when somebody does something mean." Trial Tr., Sept. 17, 2003, at 161.

SP testified that she saw the petitioner's scars "[b]ecause of what I was doing with him." Trial Tr., Sept. 17, 2003, at 83. She demonstrated to the jurors that the scars ran from his upper hip to his lower hip and described them as "pinkish brown," "squiggly lines," and "some of them are straight." Trial Tr., Sept. 17, 2003, at 84.

SP testified that the petitioner told her that she could not tell anyone because she would get a "whopping." She did not tell anyone after the first two times it happened. She did not tell her mother because she was scared she would get mad and cry. After it happened lots of times, she told her cousin, but then, because she was scared, told him that it really did not happen. She eventually told her cousin again and he told her to tell her mom, threatening to tell her mom himself if she did not. When she told her mom about what had happened, YH and her cousin were with her. There

was a family meeting at her grandmother's house, where she had to tell everyone what had happened. When she told the petitioner, he acted surprised.

SP also testified that she saw the petitioner stick his finger in YH's private part while they were all in the den. According to her, both the petitioner and YH were lying on the couch: "I seen (sic) him put his finger in her private part and every time I'll look, I'll get mad and then he'll tell me to come over and I told him don't talk to me." Trial Tr., Sept. 17, 2003, at 74. She testified that he did not do it to YH as much as he did it to her. She also said she saw the petitioner use the baby oil, rub it on his finger, and put it in YH's private part. She said he did not stop when YH told him that it hurt. SP testified that was the only thing she saw the petitioner do to YH.

The police executed a search warrant at the petitioner's home and seized K-Y jelly, cherry lotion, and Neutrogena baby oil from the night stand in the bedroom. They also seized a bottle of raspberry bath gel, a bottle of Johnson bedtime lotion, and a bottle of Johnson baby wash from the downstairs linen closet, and a disposable camera. They were not looking for any movies and did not seize a pornographic tape.

The petitioner called four witnesses who testified that they did not observe anything indicating that either of the girls was afraid of him when they saw him interacting with the girls and that he was a very truthful person.

Garfield Johnson, Jr. M.D., an obstetrician and gynecologist who examined SP's and YH's medical records, also testified for the defense. The record recounted SP telling the examining physician that the petitioner had put his "private part" in her "private part." However, the examination showed that her hymen was intact. There was no vaginal discharge or bleeding, tears,

-8-

or scarring, or any anal fissures.  Dr. Johnson testified that he would expect to see a ruptured hymen, scarring, or tearing in the situation SP described to the examining physician.

SP's medical report stated that the petitioner had put his penis into her vagina on and off for at least one year, with the last episode being about eight or nine days before the examination.  Dr. Johnson said that no cultures were done because there was no physical evidence of sexual abuse; there was no evidence of trauma, vaginal discharge, tears or scarring, and no evidence of trauma or scarring to the rectum.

Dr. Johnson also testified that one would definitely expect to see a ruptured hymen, scarring, tearing, or fissures in the situation SP described.  He further testified that one would see a ruptured hymen if there was digital penetration.

Dr. Johnson stated that YH's medical report indicated that her grandfather had been molesting her for about one year.  She did not have bleeding but did have some painful urination. The last episode of sexual abuse was about ten days before the examination.  The report indicated that there was no physical evidence of sexual abuse.  No cultures were done.  There was no scarring and the hymen was intact.

The petitioner also testified in his defense.  He said he was a pastor for 6-1/2 years and oversaw a youth program.  To his knowledge, there had been no complaints about him.  He said he was never married to Jannetta Hephzibah's mother, and his contact with Jannetta was limited while he was dating his first wife, but increased after he got married.

The petitioner testified that once Jannetta began dating her husband, she joined a religious cult and moved to the cult's headquarters after her marriage, which put a strain on their relationship. Jannetta moved back to Michigan in late 1999 and stayed with him and his wife until late 2001.

2:08-cv-12684-DML-DAS   Doc # 14   Filed 10/12/11   Pg 10 of 37   Pg ID 1518

During that time, he and his wife watched the children quite a few times.  Jannetta then separated from her husband and moved back to Detroit with her children.  She found a job and asked the petitioner to watch the children while she was at work.  The petitioner testified that he told her that he could not do so because he had his hands full with his ministry.  However, he later agreed to watch the children because the sitter Jannetta found did not work out.

The petitioner further testified that Jannetta did not always send the children to his house with clean clothes, and on many occasions she sent them to his house with no changes of underwear, socks, or Sunday clothes, forcing him to buy them.  The petitioner also testified that Jannetta was concerned that SP would not tell the truth about things and had "whipped" her when she would not admit the truth.  The petitioner said he loved the girls as if they were his own.

The petitioner also testified as to how he got the scars on his hips.  He said his condition altered his walking gait, caused undue stress on his knees and back, and caused him constant pain.  He said it also limited the positions he could be in when he had sex.  The petitioner testified that he showed SP his scars after she had showed him her scar and asked to see his.  YH and her brother were present.

The petitioner testified that on May 10, 2003, Jannetta and her nephew appeared at his church as he was preparing to give his sermon and confronted him with SP's and YH's allegations.  He said he was shocked and hurt and denied the allegations.  He told Jannetta that he would go to her house after church "to get to the bottom of this," but when he arrived at her house, no one was home.  Trial Tr., Sept. 18, 2003, at 111-12.  After learning that Jannetta was at her mother's house, the petitioner testified that he went there.  Jannetta and her mother appeared and confronted him with the girls' allegations.

-10-

The petitioner testified that he immediately denied the allegations and asked to see the girls. After YH told what happened, the petitioner told them that what actually happened was that he applied ointment to a rash in her inner thighs. He said YH agreed with him. The petitioner said the rash did not go into her private parts and denied applying ointment to her private parts. After going through the same thing with SP, he suggested that if they really believed the allegations to take the girls to a doctor.

The petitioner denied telling YH or SP to get the "motion lotion" out of the night stand drawer. He denied using cotton balls on either SP's or YH's private parts. He denied all of SP's and YH's allegations. He testified that the allegations hurt him, but they did not cause him to lose his pastoral position. Rather, he took a sabbatical to lessen the discourse within his church. The petitioner testified that he thought SP and YH had been influenced to make the allegations.

The prosecution then called its sole rebuttal witness, Mary Randol. Randol testified that she shared two children in common with the petitioner, one of them being Jannetta Hephzibah. She said she had seen the petitioner ride a motorcycle and lift his leg to get onto it. She said there was never a time when the girls had a rash. She also testified about the day the girls confronted the petitioner about the allegations. She said the petitioner's immediate reaction was "real calm." Trial Tr., Sept. 22, 2003, at 23. He did not "jump up and down and protest." *Ibid.* She said she finally asked him to "just say something." *Ibid.* The petitioner asked her what she wanted him to say, and when she suggested that he say that he did not do it, he said he did not do it. She testified that when he was confronted with SP's allegations, he "just sat there rocking his head," did not object, and did not deny them. Trial Tr., Sept. 22, 2003, at 24. According to Randol, the petitioner eventually said he put cream on YH's upper thigh because she had a rash and had no explanation for what he did to SP.

-11-

The jury deliberated for about two hours and convicted the petitioner of the criminal sexual conduct charges. His motion for a judgment notwithstanding the verdict was denied. He was sentenced to concurrent prison terms of seventeen to forty years the CSC I convictions and thirty months to fifteen years for the CSC II convictions.

Following sentencing, the petitioner filed a direct appeal in the Michigan Court of Appeals, which affirmed his convictions on January 13, 2005. *People v. Fuller*, No. 251892, 2005 WL 77152 (Mich. Ct. App. Jan. 13, 2005). The Michigan Supreme Court denied his application for leave to appeal on August 30, 2005. *People v. Fuller*, 474 Mich. 855, 702 N.W.2d 580 (2005).

On May 10, 2006, the petitioner filed a post-conviction motion for relief from judgment in the state trial court, which was denied. *People v. Fuller*, No. 03-006927-01 (Wayne Cnty. Cir. Ct. Feb. 14, 2007). The petitioner's ensuing applications for leave to appeal were denied by the Michigan Court of Appeals and the Michigan Supreme Court. *People v. Fuller*, No. 279220 (Mich. Ct. App. Nov. 5, 2007); *People v. Fuller*, 480 Mich. 1187, 747 N.W.2d 277 (2008).

The petitioner filed his habeas petition on June 23, 2008 raising the following claims:

I.      Petitioner was denied his right under the Sixth Amendment to cross-examine the complainant about possible bias and motive.

II.     Petitioner was denied a fair trial when the prosecutor [(a)] argued that the defense expert witness was there for the purpose of misleading the jury (b) shifted the burden of proof (c) appealed to the jury['s] civic duty and used inflammatory comments to draw sympathy from the jury.

III.    Petitioner was denied his right to effective assistance of counsel under the Sixth Amendment to the Constitution when counsel failed to object to the prosecutor['s] line of questions and open and closing arguments.

IV.     Petitioner was denied a fair trial where the prosecutor failed to give notice of other bad acts evidence and trial counsel was ineffective for failing to object.

V.      Petitioner['s] convictions for first-degree CSC and second-degree CSC must be
        vacated because the prosecution failed to prove guilt beyond a reasonable doubt.

VI.     Petitioner was denied a fair trial and due process was violated when the trial court
        allowed the prosecutor to admit new evidence in rebuttal.

VII.    Petitioner was denied his right under the Sixth Amendment to have a jury find other
        "behavior" found by the trial court to increase Petitioner['s] sentence.

VIII.   Petitioner received ineffective assistance of counsel on appeal when counsel failed
        to raise three issues outlined in this petition/brief.

Pet. at 19, 23, 27, 29, 36, 42, 45, 50.  The respondent filed an answer in opposition to the petition

II.

A.

The respondent initially argues that the petition was filed late and must be dismissed,

reasoning that because the petitioner missed the date for filing a timely application in the Court of

Appeals after his motion for relief from judgment was denied, the remaining state proceedings did

not toll the habeas statute of limitations.  The Court disagrees.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132,

110 Stat. 1214 (Apr. 24, 1996), amended 28 U.S.C. § 2244 to include a one-year period of

limitations for habeas petitions brought by prisoners challenging state-court judgments.  *See Vroman*

*v. Brigano*, 346 F.3d 598, 601 (6th Cir. 2003).  The one-year statute of limitations runs from the date

on which the state court judgment became final by the conclusion of direct review or the expiration

of the time for seeking such review.  *See* 28 U.S.C. § 2244(d)(1)(A). A Michigan prisoner's

conviction becomes "final" when the ninety-day period to file a petition for writ of certiorari to the

United States Supreme Court from the Michigan Supreme Court's denial of his direct appeal expires.

*See Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009); *Sherwood v. Preslesnik*, 579 F.3d 581, 585 (6th Cir. 2009); S. Ct. R. 13(1).

In this case, the petitioner's direct appeals concluded in the state courts when the Michigan Supreme Court denied his application for leave to appeal on August 30, 2005. The petitioner's conviction therefore became final ninety-days later, on November 28, 2005. He then had until November 28, 2006 to file his habeas petition unless that deadline was tolled.

Title 28, § 2244(d)(2) provides: "The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." The petitioner filed a motion for post-conviction relief in the state trial court on May 10, 2006, 163 days after his conviction became final. The one-year statute of limitations was tolled until the Michigan Supreme Court denied his application for leave to appeal on April 28, 2008. *See Lawrence v. Florida*, 549 U.S. 327, 333 (2007) (holding that the one-year statute of limitations was not tolled during the pendency of petition for certiorari to the United States Supreme Court seeking review of denial of state post-conviction relief). At that point, the petitioner had 202 days left to file his habeas petition. The petitioner filed his habeas petition on June 23, 2008, within that time frame.

But to toll the one-year habeas statute, a post-conviction motion must be "properly filed," *see* 28 U.S.C. § 2244(d)(2), and the respondent contends that the petitioner's application for leave to appeal the trial court's denial of the post-conviction motion was not properly filed because it was not submitted within 21 days. However, the petitioner filed a delayed application within the time allowed by the state court rules. *See* Mich. Ct. R. 7.205(F). In *Matthews v. Abramajtys*, 319 F.3d 780 (6th Cir. 2003), the Sixth Circuit, applying *Carey v. Saffold*, 536 U.S. 214, 219-21 (2002)

-14-

(holding that the tolling provision in § 2244(d)(2) "cover[s] the time between a lower state court's decision and the filing of a notice of appeal to a higher state court"), held that the gap between the trial court's denial of a motion for relief from judgment under Michigan Court Rule 6.500 and the filing of a delayed application for leave to appeal in the court of appeals does not count against the one-year statute of limitations period. *Matthews*, 319 F.3d at 788; *see also Spytma v. Howes*, 313 F.3d 363 (6th Cir. 2002) (same).

The respondent's argument that the present petition is time barred must be rejected.

## B.

The respondent also argues that the petitioner cannot proceed on several of his claims because he did not raise them on direct appeal, and the state's own procedural rules under which relief was denied provide an adequate and independent state law ground for that decision, which is unreviewable by a federal court. That argument is known as "procedural default." Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits." *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003) (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997)). Although ordinarily procedural-bar issues must be resolved first, "[j]udicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law." *Lambrix*, 520 U.S. at 525. In this case, the Court finds

-15-

that the interests of judicial economy are best served by addressing the merits of the petitioner's claims.

III.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering an application for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003). As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Under that review standard, mere error by the state court does not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) (internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

-16-

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court has explained that an unreasonable application of federal law is different from an incorrect application of federal law. Under that language, "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. The Supreme Court has continued to emphasize the limited nature of this review. In its recent unanimous decision in *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770 (2011), the Court reiterated that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and "[a] state court's determination that a claim lacks merit precludes habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* at 785-86 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

The distinction between mere error and an objectively unreasonable application of Supreme Court precedent creates a substantially higher threshold for obtaining relief than *de novo* review.

-17-

The AEDPA thus imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be "given the benefit of the doubt." *Renico v. Lett*, --- U.S. ---, ---, 130 S. Ct. 1855, 1862 (2010) (finding that the state court's rapid declaration of a mistrial on grounds of jury deadlock was not unreasonable even where "the jury only deliberated for four hours, its notes were arguably ambiguous, the trial judge's initial question to the foreperson was imprecise, and the judge neither asked for elaboration of the foreperson's answers nor took any other measures to confirm the foreperson's prediction that a unanimous verdict would not be reached" (internal quotation marks and citations omitted)); *see also Bray v. Andrews*, 640 F.3d 731, 737-39 (6th Cir. 2011); *Phillips v. Bradshaw*, 607 F.3d 199, 205 (6th Cir. 2010); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v. Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 511 (6th Cir. 2003) (en banc).  Moreover, habeas review is "limited to the record that was before the state court."  *Cullen v. Pinholster*, --- U.S. ---, 131 S. Ct. 1388, 1398 (2011).

### A.

The petitioner argues that his right to cross-examine fully his older granddaughter, SP, was abridged when the trial court prevented his attorney from inquiring into her past sex acts.  The alleged error implicates the Confrontation Clause, and the issue was discussed on the trial court record, but it was not raised on direct appeal.  The state trial judge's order denying the motion for post-conviction relief did not discuss the merits of the issue, and the trial judge's ruling at trial did not include any reasoning for excluding the evidence, except, perhaps, to accept the prosecution's argument.

-18-

Addressing the issue here is complicated further by the lack of a full discussion of the exact nature of the evidence the petitioner would have presented and his reason for offering it. The colloquy during the prosecutor's motion to bar the questioning and an excerpt from the post-conviction appellate brief provide some information, however. During trial on September 15, 2003, the following exchange took place:

> MS. WEINGARDEN [the prosecutor]: And also, I don't know that this is going to be a problem, but there was a different Defense Counsel at the preliminary examination than there are here today, and that Defense Counsel asked [SP], the oldest [*sic*] of the two complainants, about other sexual acts she was involved with other people. And that was clearly in violation of the Rape Shield Law. I would ask counsels not to bring that out. They have not given notice that they plan on bringing that out. I just want it on the record.
>
> MR. TOCO [defense counsel]: Judge, may I be heard?
>
> THE COURT: Yes.
>
> MR. TOCO: Judge, this is not going to Rape Shield but more to motive, definitely more probative than it is prejudicial. This a situation where we contend this is a young lady that has not only engaged in other sexual acts with other children. It's a not situation where she has engaged with other adults, but also has a history of lying about those sexual acts, Judge. That goes to the heart of the motive in this case. And it's improper for the Prosecutor to come in and say, well, we plead Rape Shield. If she had a 404(b) objection, she should have brought out at least 28 days before today's trial, which she did not, Judge. Judge, we are going to touch on it very very briefly, but, Judge, that is at the heart of our defense, these other acts.
>
> MS. WEINGARDEN: Well, then counsel had an obligation to file notice under 404. It's not my obligation to guess what they're going to do.
>
> MR. TOCA: Judge, these are facts that she has known about since the exam. These are part of this young lady's history. To say that they're sexual acts I think is a little misleading.
>
> THE COURT: She probably should know, and you should know. I don't. And I should have known. There should be something in front of me. I have no way of knowing this until now.

-19-

MR. TOCA: Judge, this is part of the Court record, part of the preliminary exam. And certainly --

THE COURT: Is there a motion before me?

MR. TOCA: I think she just made a motion in limine, Judge.

MS. WEINGARDEN: To prohibit Defense Counsel from asking the young girl about other sexual acts with other young people.

MR. TOCA: Judge, one thing, these are not sexual acts. The situation where *one occasion the young lady was found lying on top of another little boy. Hardly a sexual act. Another situation where she was found in bed lying with another little girl. Hardly a sexual act. Situation in school where little boys were asking about sexual things*, but not a sexual act, Judge.

And certainly again, these are part of the case. These are part of the facts in the case and goes to the heart of our defense that this young lady has engaged in other acts similar to the one that she is accusing my client of and lying about that.

THE COURT: Anything further?

MS. WEINGARDEN: I think it's clearly Rape Shield prohibited.

THE COURT: Well, the Court will not allow it. Let's move on.

Trial Tr., Sept. 15, 2003, at 4-7 (emphasis added).

In the petitioner's brief in support of delayed application for leave to appeal the denial of his

motion for relief of judgment, he stated:

In the instant case, the damage to the Defendant case cannot be overemphasized, considering this case came down to a credibility between the victim's [*sic*] and the Defendant. The prosecutor repeatedly argued to the jury that the children were too knowledgeable about sex for their age and that the Defendant was the one who expose them to this. Defendant wanted to show motive as to why the children would lie, based on the fact the older child was caught engaged in sexual acts with other boys and had a history of lying whenever she was in trouble. The defense theory was that the older child had influence her little sister and was able to get her to lie for her whenever, she was in trouble. Had Defendant been allowed to cross-examine to show bias or motive to lie it probable would have effected the trial's outcome. In short, the Confrontation Clause error cannot be deem harmless under either the *Chapman* or *Brecht* standard.

-20-

Brief in Supp. of Delayed Application for Leave to Appeal Denial of Mot. for Relief of Judgment at 20-21.

As mentioned, it is not clear why the trial judge refused to allow the cross-examination. It is conceivable that he found that Michigan's statute requiring advance notice of such evidence was violated. *See* Mich. Comp. Laws § 750.520j(2) (requiring 10 days notice of intent to offer evidence of other sexual conduct of victim in criminal sexual conduct case). However, the Supreme Court has held that Michigan's notice-and-hearing requirement is not unconstitutional *per se*, and it "serves legitimate state interests in protecting against surprise, harassment, and undue delay. Failure to comply with this requirement may in some cases justify even the severe sanction of preclusion." *Michigan v. Lucas*, 500 U.S. 145, 153 (1991); *see also Taylor v. Illinois*, 484 U.S. 400 (1988) (holding that the Sixth Amendment does not prohibit the preclusion of otherwise admissible evidence as a sanction for the violation of a reciprocal-discovery rule). The statute may be unconstitutional as applied, but only if its application trenches upon a defendant's confrontation or due process rights. *See Vasquez v. Jones*, 496 F.3d 564, 573-74 (6th Cir. 2007); *Boggs v. Collins*, 226 F.3d 728, 636-37 (6th Cir. 2000). Those rights can be curtailed if the State has articulated "very substantial" interests served by the limitation on those rights. *Vasquez*, 496 F.3d at 573; *see also Chambers v. Mississippi*, 410 U.S. 284, 295 (1973) (holding that "the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process"). That begs the question here.

The Sixth Amendment guarantees a defendant the right to be confronted with the witnesses against him. U.S. Const. amend. VI. The right to confrontation includes the right to conduct reasonable cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974) (holding that if cross-

-21-

examination aims to reveal the motive, bias or prejudice of a witness, it ought to be allowed). Cross-examination is the "principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316. The exposure of a witness' motivation for testifying is a proper and important function of the constitutionally protected right of cross-examination. *Id.* at 316-17.

In analyzing whether an evidentiary restriction violated the Confrontation Clause, "the Supreme Court has 'distinguished between a "general attack" on the credibility of a witness — in which the cross-examiner "intends to afford the jury a basis to infer that the witness's character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony" — and a more particular attack on credibility "directed toward revealing possible biases, prejudices, or ulterior motives as they may relate directly to issues or personalities in the case at hand.""" *Lewis v. Wilkinson*, 307 F.3d 413, 419 (6th Cir. 2002) (quoting *Boggs*, 226 F.3d at 736 (interpreting *Davis* and *Delaware v. Van Arsdall*, 475 U.S. 673, 681-84 (1986), as setting forth the clearly-established rule that "cross-examination as to bias, motive or prejudice is constitutionally protected, but cross-examination as to general credibility is not.").

It appears from the discussion at trial that the petitioner wanted to ask about SP's past sexual encounters to show that SP had lied before when caught in sex acts with boys and girls, and she could persuade her sister, YH, to lie for her as well. And according to the appellate brief, he also wanted to blunt the prosecution's anticipated argument that the children were too knowledgeable about sexual matters to have learned it anywhere but their activities with the petitioner.

The petitioner's motivation to ask those questions, perhaps, could be characterized as an attack on general credibility. The petitioner argues instead that the questions would have been designed to elicit information from SP about her specific responses to a given situation that

-22-

paralleled somewhat the circumstances alleged against the petitioner.  That is not quite the picture presented by the evidence, however.  SP was never "caught" in or accused of any sex acts with the petitioner.  Rather, she revealed the conduct herself, first to her cousin and then to her mother, followed by statements of varying consistency to social workers and investigators.  There does not appear to be a triggering event that stimulated a motive to lie, as there apparently was in her other encounters.  Nor does the excluded evidence appear to support the suggestion that SP could persuade YH to lie about YH's own sexual involvement with the petitioner.

The evidence may have supported an inference that SP learned about the details of sexual behavior from a source other than the petitioner.  However, that inference is equivocal, having a chicken-and-egg quality to it.  It is conceivable that the jury also could have inferred that SP's acts with children her own age was an outgrowth of the abuse inflicted on her by the petitioner.

But the evidence could have shed light on SP's tendency to lie about sexual conduct in a more general way that avoids the strictures of *Lewis* and *Boggs*.  Because the evidence would have addressed SP's tendency to lie about sexual situations, rather than her untruthfulness in general, the proposed questioning most likely would have implicated the Confrontation Clause.

As note above, however, a State's "very substantial" interests may justify limiting cross-examination in a way that is consistent with the Confrontation Clause.  The Supreme Court has stated that Michigan's rape shield statute "represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy." *Lucas*, 500 U.S. at 150.  The state court never articulated on the record a rationale that balanced those interests against the petitioner's Confrontation Clause rights, but the absence of such reasoning does not dilute the degree of deference this Court must accord the state court's ultimate

-23-

ruling.  "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784.  This Court cannot say that the state court unreasonably applied the Supreme Court's Confrontation Clause jurisprudence by determining that the interests served by the rape shield statute substantially outweighed the petitioner's interest in eliciting testimony that may have undermined one of the victim's credibility.

Even if that determination could be found to be unreasonable, the Confrontation Clause violation is subject to harmless-error analysis. *Van Arsdall*, 475 U.S. at 681-84.  On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness.  *Fry v. Pliler*, 551 U.S. 112, 121-22 (2007); *see also Vasquez*, 496 F.3d at 574-75. Under that standard, habeas relief cannot be granted unless the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result.  *Brecht*, 507 U.S. at 638.

In determining whether the restriction was harmless, a court must consider a number of factors, "includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'"  *Van Arsdall*, 475 U.S. at 684.

This Court does not find that the petitioner's inability to cross-examine SP about her prior sexual acts adversely affected the outcome of the trial.  Defense counsel never argued that SP had lied about the incidents, but even if she had, he did not show that she had a motive to lie about the petitioner's conduct.  The inference of untruthfulness to be drawn from the excluded evidence was

-24-

weak because the circumstances of the events were not parallel. The suggestion that the evidence would have provided an alternate source for the children's experiences and information was plausible but equivocal. The Court cannot say that excluding the evidence had a "substantial and injurious effect" on the outcome of the trial.

B.

The petitioner next alleges that the prosecutor unfairly denigrated his expert medical witness by calling him a hired gun, shifted the burden of proof by asking why the petitioner had not called the actual treating physician, appealed to the civic duty of the jury, and used inflammatory comments to draw sympathy from the jury.

It is well-established that prosecutors must "'refrain from improper methods calculated to produce a wrongful conviction.'" *United States v. Young*, 470 U.S. 1, 7 (1985) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). However, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004) (citing *Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003)). Prosecutorial misconduct may warrant habeas corpus relief only if the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "To constitute a denial of due process, the misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *Byrd v. Collins*, 209 F.3d 486, 529-30 (6th Cir. 2000) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)). "The Court must examine 'the fairness of the trial, not the culpability of the prosecutor.'" *Pritchett*, 117 F.3d at 964 (quoting *Serra v. Michigan Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993)).

-25-

The Court first considers whether the prosecutor's conduct or remarks were improper. *Slagle v. Bagley*, 457 F.3d 501, 515-16 (6th Cir. 2006). If they were, the Court then must decide whether the improper acts were so flagrant as to warrant relief. *Id.* at 516. The Sixth Circuit applies a four-factor test to any inappropriate prosecutorial conduct to determine whether it was flagrant: "(1) whether the evidence against the defendant was strong, (2) whether the conduct of the prosecution tended to mislead the jury or prejudice the defendant; (3) whether the conduct or remarks were isolated or extensive; and (4) whether the remarks were made deliberately or accidentally." *Id.* (citation omitted).

The petitioner first contends that the prosecutor shifted the burden of proof by questioning why the defendant did not call the children's treating physician instead of the defense expert, whom she characterized as a hired gun. A prosecutor may not argue or imply that the burden of persuasion falls to a defendant to prove his innocence. *See United States v. Clark*, 982 F.2d 965, 968-69 (6th Cir. 1993). However, a prosecutor is entitled to point out the lack of evidence supporting defense theories. *United States v. Forrest*, 402 F.3d 678, 686 (6th Cir. 2005).

In this case, the prosecutor's argument that the petitioner had an obligation to call any witness was improper. However, it is unlikely that the argument shifted the burden of proof or deprived the petitioner of a fair trial because any prejudice that might have resulted from the comment was cured by the trial court's lengthy instructions on the presumption of innocence and the proper burden of proof; the court told the jury in frank terms that the petitioner did not have to prove his innocence. *See Scott v. Elo*, 302 F.3d 598, 603-04 (6th Cir. 2002). Furthermore, the doctor who testified said he was not being paid for his time or services but that he was there because he had a "relationship" with the defense attorney's law firm. The prosecutor was justified in

-26-

questioning the doctor's impartiality, and the term "hired gun" was not so inflammatory that it affected the fairness of the trial.

The petitioner next alleges that the prosecutor committed misconduct by appealing to the jurors to do their civic duty and draw sympathy from them during voir dire, her opening statement, and her closing argument. During opening statements, the prosecutor stated, "To the rest of you, what you are going to hear is some very graphic, disgusting testimony. That's the best word I can use to describe it. And I need to know if you can stomach sitting here and hearing that." Trial Tr., Sept. 15, 2003, at 29. The prosecutor also stated, "We're here today because that man sexually assaulted his two young granddaughters. What you're going to hear will disgust and sicken you, and for that I apologize." *Id.* at 142. During closing argument, he stated, "Don't apologize for your verdict. Don't feel guilty for your verdict. You were sworn to take an oath to do the right thing, to do justice, and that's what we ask you to do, find him guilty." Trial Tr., Sept. 22, 2003, at 83.

"'Unless calculated to incite the passions and prejudices of the jurors, appeals to the jury to act as the community conscience are not *per se* impermissible.'" *Byrd*, 209 F.3d at 539 (quoting *United States v. Solivan*, 937 F.2d 1146, 1151 (6th Cir. 1991)). A prosecutor does not overstep the bounds of propriety by appealing to the jurors' sense of justice. *Bedford v. Collins*, 567 F.3d 225, 234 (6th Cir. 2009). A prosecutor does not act improperly unless he or she "calls on the jury's emotions and fears — rather than the evidence — to decide the case." *Johnson v. Bell*, 525 F.3d 466, 484 (6th Cir. 2008).

The petitioner has not shown that the prosecutor made the statements with the intention of inciting the passions or prejudices of the jurors. The prosecutor's language was not inflammatory, and it does not appear to be intended to incite prejudice. The prosecutor's use of ordinary

-27-

terminology, such as "shocking" or "ridiculous," may have evoked sympathy for the complainants, but the prosecutor did not ask the jury to convict on that basis. Rather, because the testimony was that the petitioner digitally and anally penetrated his granddaughters and forced the older one to perform oral sex on him and to submit to anal sex, the prosecutor was justified in warning the jury that the testimony they would be hearing was upsetting. Indeed, such testimony likely would offend a normal person's sensibilities, and the prosecutor's warning to that effect was appropriate. It was not appropriate for the prosecutor to state "that man sexually assaulted his two young granddaughters," since that statement implied personal knowledge on the prosecutor's part. But that remark was not flagrant; more likely it was attributable to inexperience or a surfeit of enthusiasm. Moreover, the jury was properly instructed as to what they should and should not consider as evidence. The Court finds that the prosecutor's conduct did not offend the Due Process Clause.

## C.

The petitioner next argues that he received ineffective assistance of trial counsel because his attorney failed to object to the instances of prosecutorial misconduct discussed in the previous section. To show a violation of the Sixth Amendment right to effective assistance of counsel, a petitioner must demonstrate "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005). The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

Because the prosecutorial-misconduct claims lack merit, defense counsel was not ineffective by failing to object, and habeas relief is not warranted on the petitioner's ineffective-assistance-of-

counsel claim based on the lack of objection to to the prosecutor's statements during *voir dire*, opening statement, and closing argument.

## D.

The petitioner next argues that the prosecutor engaged in misconduct by failing to provide notice of the intent to introduce evidence of other acts as required by Michigan state law. Those other acts, the petitioner explains, consist of the victims' testimony about uncharged acts of sexual abuse. The violation of the State's notice requirement will not warrant relief from this Court. *See, e.g., Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (holding that "federal habeas corpus relief does not lie for errors of state law").

On direct review applying a plain-error standard, the Michigan Court of Appeals concluded that the petitioner failed to show "that he would have offered rebuttal evidence or taken other effective action if the prosecutor had provided timely notice under MRE 404(b)(2)." *Fuller*, 2005 WL 77152, at *4. The Court of Appeals found that the absence of notice did not have any significant effect on the proceedings. *Id.* at 5. The petitioner has not shown that the prosecution's failure to give the notice impaired his defense or otherwise rendered his trial fundamentally unfair. He is not entitled to habeas relief on this claim.

## E.

In his fifth habeas claim, the petitioner argues that he received ineffective assistance of trial counsel because his attorney failed to object to the prosecutor's failure to provide notice that she intended to introduce evidence of uncharged offenses, as stated above. Again, because the Court finds that the petitioner was not prejudiced by the prosecutor's conduct — and thereby no prejudice

can flow from defense counsel's conduct — the Court cannot find that the petitioner's Sixth

Amendment rights were violated when defense counsel did not object to the lack of notice.

F.

In his sixth claim, the petitioner contends that the prosecution presented insufficient evidence

to prove his guilt beyond a reasonable doubt with respect to his three CSC I convictions involving

YH because her testimony described only non-penetrative sexual contact, and with respect to his

conviction for CSC II involving YH because the prosecutor could not establish an act of CSC II

without identifying an act of sexual contact that did not involve penetration.  The Michigan Court

of Appeals addressed these issues and concluded that there was sufficient evidence presented on

both categories of crimes:

> First-degree CSC involves acts of sexual penetration under the circumstances delineated by the statute, including acts with a person under thirteen years of age. MCL 750.520b(1)(a).  MCL 750.520a(o) defines "sexual penetration" as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required."  The younger victim testified that defendant moved his hand around under her underpants while they sat on a couch under a blanket in defendant's home.  Although she did not use precise anatomical terms to describe these incidents, when asked what part of her body defendant touched, she replied, "my tutu," "[m]y private part," or "my private," which she described as the part of her body that she used to urinate and that she wiped with tissue after urinating.  Similarly, the older victim stated that she saw defendant stick his finger in the younger victim's "private part."  The younger victim stated that the touching felt uncomfortable, it did not tickle, and that it hurt when "[h]e was doing it hard."  She estimated that it happened more than three times. The prosecutor asked the younger victim to put her hand on a table and demonstrate what defendant did with his hand.  She stuck out her finger during the demonstration and stated that he moved his finger back and forth, hard, on her "private."
>
> The testimony of both victims about defendant touching the younger victim, viewed most favorably to the prosecution, was sufficient to establish that penetration of the younger victim occurred.  Although the younger victim used childish and unsophisticated terminology, she indicated that defendant touched the part of her body that she used to urinate.  This testimony, together with the testimony describing

-30-

the amount of pressure defendant applied, allowed the jury to infer that defendant touched the younger victim between the labia. An intrusion into the labia constitutes penetration of the female genital opening under MCL 750.520a(o). *People v. Bristol*, 115 Mich. App 236, 238; 320 NW2d 229 (1981); *see also People v. Legg*, 197 Mich. App 131, 133; 494 NW2d 797 (1992) (the act of cunnilingus described by the complainant involved penetration because the complainant testified that the defendant touched the part of her body that she "[went] to the bathroom with"). Furthermore, her demonstration with her finger suggested that defendant prodded into her genital opening when he touched her. Consequently, a trier of fact could find from the younger victim's testimony that defendant engaged in sexual penetration within the meaning of the statute.

The younger victim also described incidents in which defendant used cotton balls to put cream or oil "inside" or "in" her private parts. She also stated that defendant put his finger "inside" her bottom, but when the prosecutor questioned her further, she did not know if he touched her anus or the cheeks of her buttocks. She admitted that she had not disclosed these incidents before trial. Defendant does not dispute that this testimony was sufficient to establish penetration, but he contends that these incidents were not the incidents for which he was charged because she did not reveal them before trial.

. . .

Defendant also claims that the evidence was insufficient to support his second-degree CSC conviction involving the younger victim because the prosecutor did not identify any specific acts of sexual contact that did not involve penetration. Second-degree CSC requires proof that the defendant intentionally touched the complainant's intimate parts for purposes of sexual arousal or gratification. MCL 750.520c(1)(a); MCL 750.520a(n); *People v. Lemons*, 454 Mich. 234, 253; 562 NW2d 447 (1997). Second-degree CSC is a cognate lesser offense of first-degree CSC because the second-degree offense requires proof that the defendant acted with the intent to seek sexual arousal or gratification. *Lemons*, *supra* at 253-254. Consequently, it is possible to commit first-degree CSC without first committing second-degree CSC, but in most cases, second-degree CSC is a factually included offense within first-degree CSC. *Id.* at 524 n 29.

Here, defendant does not claim that the prosecutor failed to prove the sexual arousal or gratification element of second-degree CSC. Rather, he contends that the prosecutor could not establish an act of second-degree CSC without identifying an act of sexual contact that did not involve penetration. However, the absence of penetration is not an element of second-degree CSC and, as our Supreme Court recognized in *Lemons*, *supra* at 254 n 29, second-degree CSC is a factually included offense within first-degree CSC if the arousal or gratification element is established. The younger victim testified that there were more than four incidents when defendant touched her inappropriately. Therefore, the jurors could have considered one of the

incidents as an act of second-degree CSC, while considering three other incidents as acts of first-degree CSC.

*Fuller*, 2005 WL 77152, at *1-3.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The critical inquiry on habeas review of the sufficiency of the evidence to support a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. . . . [T]his inquiry does not require a court to "ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citation and footnote omitted) (emphasis in original). In the habeas context, "[t]he *Jackson* standard must be applied 'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Brown v. Palmer*, 441 F.3d 347, 351 (6th Cir. 2006) (quoting *Jackson*, 443 U.S. at 324 n.16). "A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews*, 319 F.3d at 788 (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). A habeas court must defer to the fact finder for its assessment of the credibility of witnesses. *Id.* at 788. Accordingly, "[t]he mere existence of sufficient evidence to convict . . . defeats a petitioner's claim." *Id.* at 788-89. The Court does not need to be convinced that the petitioner is actually guilty beyond a reasonable doubt. *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995).

The only element in dispute on the CSC I charge involving YH is "sexual penetration," which the Michigan legislature has defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of another person's body, but emission of semen is not required." Mich. Comp. Laws § 750.520a(o). The Michigan Court of Appeals summarized and discussed thoroughly and accurately the trial testimony of YH and SP. There is no need to repeat that discussion; rather, it is sufficient to say that the record contained evidence from which the jury could conclude beyond a reasonable doubt that all the elements of each of the crime were proved. The state courts did not unreasonable apply the familiar *Jackson* standard.

As to his conviction for CSC II involving YH, the petitioner alleges insufficient evidence because the prosecutor did not identify any specific acts of sexual contact that did not involve penetration. The elements of second-degree criminal sexual conduct, as charged in this case, are (1) sexual contact (2) with a person under thirteen years of age. *See* Mich. Comp. Laws § 750.520c(1)(a). "'Sexual contact' includes the intentional touching of the victim's or actor's intimate parts or the intentional touching of the clothing covering the immediate area of the victim's or actor's intimate parts, if that intentional touching can reasonably be construed as being for the purpose of sexual arousal or gratification, done for a sexual purpose, or in a sexual manner . . . ." Mich. Comp. Laws § 750.520a(q). The phrase "intimate parts" "includes the primary genital area, groin, inner thigh, buttock, or breast of a human being." Mich. Comp. Laws § 750.520a(e).

YH testified that there were more than four incidents when the petitioner touched her inappropriately. The jurors could have considered one of the incidents as an act of CSC II, while considering the three other incidents as acts of CSC I. Based upon that evidence, this Court finds

-33-

that a rational juror could have found both CSC I and CSC II involving the younger victim, YH, as the state courts define those elements of the crime. The Michigan Court of Appeals did not misapply the *Jackson* standard as to those crimes, either.

G.

The petitioner argues in his seventh habeas claim that the trial court erred when it allowed the prosecution to call Mary Randol as a rebuttal witness. He alleges that the admission of her rebuttal testimony violated his right to a fair trial. The petitioner raised that issue in the Michigan Court of Appeals on direct appeal as a violation of state law, not as a violation of his due process right under the Constitution. The petitioner, however, failed to raise the claim in the Michigan Supreme Court. Therefore, the respondent argues that the claim is unexhausted because it was not fairly presented to both state appellate courts. The exhaustion doctrine requires that a petitioner "fairly present" his federal constitutional claims to all levels of the state appellate system. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). The Court agrees. The Court, however, has discretion to deny the petitioner's unexhausted claim on its merits. 28 U.S.C. § 2254(b)(2).

The Court concludes the petitioner's claim is evidentiary in nature and is non-cognizable in this federal-habeas proceeding. *See Slack v. Cason*, 258 F. Supp. 2d 727, 733 (E.D. Mich. 2003). The Michigan Court of Appeals treated the argument as such and rejected it.

Moreover, Randol's testimony was properly admitted as rebuttal evidence to counter the petitioner's own testimony and did not violate due process. *See, e.g.*, *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000); *White v. Withrow*, No. 00-74231-DT, 2001 WL 902624, *7 (E.D. Mich. June 22, 2001) (petitioner's due process right was not violated when the prosecution "split the proofs" by having a witness testify in rebuttal rather than case-in-chief). The petitioner has not

-34-

shown that the admission of Randol's testimony violated any clearly established constitutional right or otherwise rendered his trial fundamentally unfair.  Habeas relief is not warranted on this claim.

H.

The petitioner's eighth claim for habeas relief focuses on the state court's sentencing procedure.  The petitioner contends that his sentence was increased based upon facts neither proven to a jury beyond a reasonable doubt nor admitted by him.  The petitioner argues, therefore, that the trial court judge violated his Sixth Amendment right to a trial by jury by using facts to score his sentencing guidelines that had not been submitted to a jury and proven beyond a reasonable doubt or admitted to by the petitioner.  The petitioner believes that *Blakely v. Washington*, 542 U.S. 296 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), support his position.  However, the Sixth Circuit has held that *Blakely* does not apply to judicial fact-finding under Michigan's indeterminate sentencing scheme.  *Montes v. Trombley*, 599 F.3d 490, 497 (6th Cir. 2010); *see also Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) ("[The petitioner] argues that the Michigan trial judge violated *Apprendi* by finding facts that raised his minimum sentence.  But *Harris v. United States* tells us that *Apprendi*'s rule does not apply to judicial fact finding that increases a minimum sentence so long as the sentence does not exceed the applicable statutory maximum.").  This Court is bound by those decisions.  The petitioner is not entitled to habeas relief with respect to his sentencing claim.

I.

The petitioner's final habeas claim alleges ineffective assistance of appellate counsel.  The petitioner maintains that his appellate attorney was ineffective for not raising habeas claims one, two, three, and eight in his direct appeal from his conviction.  The petitioner raised that issue in his

-35-

motion for relief from judgment in the trial court, which held that appellate counsel was not ineffective by failing to make meritless arguments. This Court agrees.

The petitioner was not entitled to compel his appointed attorney to raise all nonfrivolous claims on appeal if counsel, as a matter of professional judgment, elected not to raise the claims. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). In fact, "the process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail . . . is the hallmark of effective appellate advocacy." *O'Sullivan v. Boerckel*, 526 U.S. 838, 858 (1999) (quotation marks and citations omitted).

The Court has reviewed and found no merit in the claims that the petitioner contends his appellate attorney should have raised on appeal. "[A]ppellate counsel cannot be ineffective for a failure to raise an issue that lacks merit," *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001), and there is no reasonable probability that, but for appellate counsel's failure to raise the claims, the petitioner would have prevailed on appeal. Consequently, the petitioner's right to competent counsel on appeal was not violated, and the state court's adjudication of the petitioner's claim was not contrary to or an unreasonable application of *Strickland*.

IV.

The Court concludes that the state court decision in this case was not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts of the case. The petitioner has not established that he is presently in custody in violation of the Constitution of the United States.

-36-

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus is **DENIED**.


                                            s/David M. Lawson
                                            DAVID M. LAWSON
                                            United States District Judge

Dated:   October 12, 2011

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on October 12, 2011.

                          s/Deborah R. Tofil
                          DEBORAH R. TOFIL

---